James R. BAKER, et al., Plaintiffs,

v.

**The UNITED STATES, Defendant.**

**No. 94–453C.**

United States Court of Federal Claims.

Aug. 11, 1995.

Barry P. Steinberg, Arlington, VA, for plaintiffs. William A. Aileo, Springfield, PA, of counsel.

John S. Groat, Washington, DC, with whom was Assistant Attorney General Frank W. Hunger, for defendant. Major Joginder Dhillion, Department of the Air Force, of counsel.

## ORDER

MILLER, Judge.

Plaintiffs filed a motion to strike the declarations of Lt. Gen. John E. Jaquish and Lt. Col. James L. Wilson, Jr., submitted by defendant in support of its cross-motion for summary judgment. Defendant opposed and plaintiffs have replied. Plaintiffs, 80 retired United States Air Force colonels, challenge their selection for retirement by the Fiscal Year 1992 Selective Early Retirement Board

(the "FY92SERB") formed pursuant to 10 U.S.C. § 638 (1988). The principal issue on the cross-motions will be whether the FY92SERB violated plaintiffs' rights under the Equal Protection Clause by impermissibly considering factors of race and sex to the prejudice of non-Hispanic white males. The subject declarations explain that certain actions taken by the FY92SERB were actually other than those reflected by the administrative record. Plaintiffs would have defendant bound to the explanation contained in the administrative record.

## FACTS

Congress created the selective early retirement process to downsize the armed forces in an orderly and equitable manner. *See* 10 U.S.C. § 638. Pursuant to 10 U.S.C. § 638, in August 1991 the Secretary of the Air Force (the "Secretary") developed a plan to reduce the number of colonels on active duty as part of the congressionally-directed force reduction.

On September 6, 1991, Headquarters, United States Air Force Military Personnel Center (the "Air Force"), sent a message to all commands officers that a FY92SERB would convene on January 6, 1992. The Air Force also stated that 1) the FY92SERB would consider for early retirement all colonels who had served at least two years of active duty as of October 31, 1991, and whose names were not on a list of officers recommended for promotion; and 2) a certain number of colonels, not to exceed 30 percent of the total potential pool of eligible officers, would be retired as a result of the FY92SERB process. *See* 10 U.S.C. § 638(a)(2).[1] On November 12, 1991, the Secretary approved both the "Retention Recommendation Form" to be completed by officers in chain of command to recommend retirement or retention of each eligible colonel and the "Formal Charge" (the "Charge")

---

1. On December 5, 1991, Congress, through Title V § 503(B) of the National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub.L. No. 102–190, 105 Stat. 1290 (1991), excluded from consideration any officer "who has been approved for voluntary retirement under section 3911, 6323, or 8911 of this title, or who is to be involuntarily retired under any provision of law during the fiscal year in which the selection board is convened or during the following fiscal year."

or instructions used to guide the FY92SERB's selections.

On January 6, 1992, the FY92SERB selected 29.2 percent of the eligible pool of colonels for early retirement, *i.e.*, 610 out of 2,086. Overall, 93 of the 2,086 colonels were members of a minority group and/or women.[2] Of those 93, 28 or 30.1 percent were selected for early retirement. No female officers were chosen for early retirement.

Plaintiffs are among the 610 colonels chosen by the FY92SERB for early retirement. On July 13, 1994, plaintiffs filed in the United States Court of Federal Claims a Preliminary Complaint Pursuant to RCFC 27(A) with a Motion for Leave To Take Discovery. Plaintiffs argued that the Charge, which the Secretary approved for use by the FY92SERB, was facially discriminatory in that it favored women and minorities. The section of the Charge establishing the criteria that the board was to apply in dealing with women and minorities and to which plaintiffs object states:

> Your evaluation of minority and women officers must clearly afford them fair and equitable consideration. Equal opportunity for all officers is an essential element of our selection system. In your evaluations of the records of minority officers and women officers, you should be particularly sensitive to the possibility that past individual and societal attitudes, and in some instances utilization policies or practices, may have placed these officers at a disadvantage from a total career perspective. The board shall prepare for review by the Secretary and the Chief of Staff, a report of minority and female officer selections as compared to the selection rates for all officers considered by the board.[3]

At the end of the selection process, members of the FY92SERB certified the board proceedings to the Secretary in a letter signed on January 13, 1992, by Lt. Gen. Jaquish, the 10 FY92SERB voting members, and 17 staff personnel. On August 10, 1994, before any discovery was allowed, defendant filed this letter, included in the Force Reduction Branch Records, which were part of the administrative record. It reads, in pertinent part:

> With your guidance concerning minorities and women specifically in mind, the board thoroughly reviewed the records of all minority and woman officers eligible for selective early retirement. The retention rates for blacks and women were better than the overall board average. The retention rate for hispanic officers was below the board average. To ensure each minority and woman officer received fair and equitable consideration, the board president carefully reviewed their records and the scoring results. Where there was any doubt as to the competiveness [sic] of an officer, he caused the record to be rescored to resolve the doubt. It is the judgement of the board president and the members of the board that those officers recommended for retention are the best qualified officers.

Based on *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), plaintiffs argued that a government entity may discriminate only when acting to remedy specific prior discrimination. Incident to filing their preliminary complaint, plaintiffs sought pre-complaint discovery pursuant to RCFC 27(a) in order "to determine more precisely: what finding or determination of discrimination warranted the use of a race and sex conscious selection process by the Fiscal Year 1992 Department of the Air Force Selective Early Retirement Board...." Plfs' Prelim.Compl. filed July 13, 1995, at 7–8.

In its brief opposing pre-complaint discovery, defendant argued that the discovery sought by plaintiffs would be inconsistent with the limited scope and standard of judicial review of military decisions. Specifically,

---

**2.** Women accounted for 0.62 percent of the total colonels considered by the FY92SERB.

**3.** An undated preliminary draft of the revised Charge read:

> The goal for this selection board is to achieve a percentage of minority and female selections from in the promotion zone at a rate not less than the selection rate for the total number of officers in the promotion zone. Prior to adjournment, the board must review the extent to which this goal has been met and explain reasons for not meeting this goal.

defendant resisted "any judicial review beyond the legal sufficiency of individual records under consideration, the legality [of the] composition of the board, and the facial legality of the Secretary's charge to the board." Def's Br. filed Aug. 10, 1994, at 11. Plaintiffs' defended their request for this pre-complaint discovery:

> This case is unlike most military personnel cases in which the focus of review is on the correctness of an individual's military personnel records. Rather, the discovery requested here is about processes at the Departmental level which curtailed the independence of the [FY92]SERB and made issues other than the merit of an individual's record of service factors in determining eligibility for continued active duty....

Plfs' Br. filed Sept. 1, 1994, at 9.

In an order issued on September 23, 1994, the court required defendant to answer specified interrogatories that concerned "issues surrounding the 'Formal Charge' and information considered by the SERB in carrying out that charge."[4]

On December 20, 1994, plaintiffs submitted an Amended Motion To Compel Discovery, or, in the Alternative, for Sanctions.[5] Plaintiffs requested a further order compelling defendant to respond to the discovery directed by the September 23, 1994 order. They also requested that the court extend the time for completion of discovery beyond November 30, 1994, the date specified in the September 23 order. This motion was granted in part and denied in part on February 1, 1995, by an order to the following effect:

> The purpose of the discovery allowed on September 23, 1994, was to allow plaintiffs properly to frame their complaint.... Plaintiffs have uncovered sufficient information to file a complaint, subject to amendment if discovery on that complaint reveals any additional basis for relief. However, the court is of the view, consistent with RCFC 1(a)(2), that the interest of fairly administering the progress of this case is better served by considering any discovery requests of plaintiffs in the context of a complaint. The ambit of discovery, and the legitimate objections thereto, may be evaluated more soundly in the context of the allegations to which the request legitimately pertains.

Plaintiffs filed an Amended Complaint Pursuant to RCFC 27(a)(3) on February 14, 1995, consisting of 7 counts. Count 1 alleged that by giving special retention benefits to minorities and women, absent any institutional discrimination within the Air Force or the Department of Defense, the Air Force had denied plaintiffs their Fifth Amendment rights to equal opportunity for retention on active duty and full retirement benefits.[6]

Count 2 pleaded that the Air Force discriminated against plaintiffs by favoring officers in security assistance and attache train-

---

4. The order explained:

> The Claims Court has held that in light of the Supreme Court rulings, "judicial review should be limited to the record developed before the military review board...." *Long v. United States*, 12 Cl.Ct. 174, 177 (1987); *see also Bishop v. United States*, 26 Cl.Ct. 281, 285 (1992); *Wyatt v. United States*, 23 Cl.Ct. 314, 319 (1991).
>
> However, consideration of material outside the scope of the administrative record is appropriate *in order to determine whether the* record is adequate. "It will often be impossible ... for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not...." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir.1980).

5. Plaintiffs' first motion to compel discovery or for sanctions was filed on November 16, 1994.

In an order entered on December 2, 1994, the court

> pointed out that plaintiffs ... misread the court's order which granted the [discovery] motion only in part and identified the interrogatories that were to be answered. Therefore, plaintiffs shall refile their motion to compel addressing only the discovery that has been allowed.

6. Defendant has not objected to subject matter jurisdiction, apparently agreeing that plaintiffs complain of a violation of military procedure or regulation regarding the conduct of the SERB. *See also* Def's Br. filed Aug. 10, 1994, at 12. ("Consistent with the Supreme Court's recognition of the availability of judicial review for *constitutional* violations, *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1986), judicial review of constitutionality of the Secretary's Formal Charge to a selection board may properly be available." (Emphasis in original.))

ing. The pertinent section of the Charge dealing with officers in security assistance and attache training to which plaintiffs object reads:

> To meet Air Force command, leadership, and professional supervisory and technical requirements, officers with both highly specialized and more generalized skills and experience are needed. (In addition, you should give particular consideration to officers in training for unusually hard-to-fill requirements in security assistance and the defense attache system.) The Air Force is relying on your experience and mature judgment to relate all these factors in your subjective evaluation and to retain only those officers who should remain on active duty. . . .

According to plaintiffs, such favoring of a group of officers violates 10 U.S.C. § 277 (1994), which at the time of the FY92SERB proceedings provided: "Laws applying to both Regulars and Reserves shall be administered without discrimination—(1) among Regulars; (2) among Reserves; and (3) between Regulars and Reserves."

Count 3 charges that the FY92SERB violated Department of Defense ("DOD") Military Equal Opportunity policy set forth in 32 C.F.R. §§ 51.4, 51.5, by favoring minorities and women. Count 4 alleges that the Air Force effectively denied plaintiffs the benefit of changes to the FY92SERB process made pursuant to the National Defense Authorization Act for Fiscal Years 1992 and 1993, Pub.L. No. 102–190, 105 Stat. 1290 (1991) (the "Authorization Act"). Specifically, plaintiffs contend that although the Authorization Act allowed applications for voluntary retirement to be submitted through the end of fiscal year 1993, the Air Force refused to accept applications after February 1, 1992. Count 5 specifies that the Air Force insufficiently informed plaintiffs about the FY92SERB process and their options. Count 6 alleges that the Air Force conducted the FY92SERB in violation of DOD policy, which states "that the authority to select officers who are serving in the grades of . . . colonel . . . for early retirement shall be used sparingly." DOD Directive 1332.32 (Jan. 22, 1982). Count 7 contends that the Air Force

violated DOD Directive 1332.32 by using a preselection process through Retention Recommendation Forms.

On March 24, 1995, plaintiffs filed a motion for summary judgment as to counts 1–3. Defendant opposed and cross-moved on all counts, arguing, once again, that judicial review is permissible only to ascertain "the legal sufficiency of the individual records under consideration, the legality of the composition of the board, and the facial legality of the Secretary's charge to the board." Def's Br. filed June 1, 1995, at 23. However, according to defendant, because the court had allowed discovery into the meaning of the Charge, defendant submitted the declarations explaining the board proceedings in detail.

In a declaration that was not part of the record of the FY92SERB and that defendant submitted in support of its cross-motion for summary judgment, Lt. Col. James L. Wilson, Jr., who served during the period in issue as Chief of Operations, Selection Board Secretariat, Air Force Military Personnel Center, Randolph Air Force Base, Texas, attempts to explain the January 13, 1992 letter that was used for promotion boards prior to 1992:

> With respect to the CY92 SERB, the language in paragraph 5 of the report of board proceedings was identical to that which had been developed for promotion boards. Unfortunately, although it [the above statement] is technically accurate, it is *particularly* misleading in the context of a SERB. When a record is returned for rescoring in promotion boards, the President will typically send the record to a panel which has not reviewed it. Because the procedures involved in a SERB required both panels to review all of the records which were being recommended for early retirement, there was rarely any reason to rescore a record. In the CY92 SERB, to the best of my recollection, only one record, that of a former Prisoner of War, was individually selected for rescoring.

Declaration of Lt. Col. James L. Wilson, Jr., (undated), at 2–3 (emphasis in original).

In a second extra-record declaration, Lt. Gen. John E. Jaquish, President of the FY92SERB, explained the procedures actually followed by the FY92SERB:

I am familiar with the language in the Secretary's formal charge to the board which addresses women and minorities. I understood this language to mean that all officers should receive fair and equitable treatment. In other words, all of the eligible officers should receive an equally fair opportunity to be retained. I did not construe the charge to require that the SERB produce any particular outcome with regard to the ultimate selection rates of women and minority officers. I believe that all of the members of the SERB construed the formal charge in this same manner. It was with this understanding that I carried out my responsibilities as Board President.

I did not receive any guidance regarding the fair and equitable treatment of women and minority officers, other than that which was included in the formal charge. I did not receive a definition of "minority." The absence of guidance regarding the definition of the term "minority" did not concern me as I did not believe the charge required me to identify and afford any special preference to officers based upon their racial or ethnic background. I understood my responsibility to be to ensure that all officers were afforded "fair and equitable consideration" and that we would retain officers on a "best qualified" basis.

... The SERB reviewed all of the records and scored on a scale of 6 (lowest in potential) to 10 (absolutely superior) in increments of one-half point. (The records of the line officers were randomly separated and each panel on the line officer-board scored half of the records.) Where any two scores awarded to a given record differed by more than one and a half points, the difference was considered to be significant and the panel reviewed the record to resolve the difference to no more than one and a half points. Once all of the records were scored and differences were resolved, an order of merit was established.

The "quota", the percentage of officers that were to be selected for separation [i.e., no more than 30 percent], was applied to the reverse of that relative order of merit so that the officers with the lowest scores were selected for separation. . . .

When we drew the lines for the . . . 30 percent cut, the lines fell within a group of officers having the same score. . . . [I]f the 30 percent cut line fell between officers who had the same score, all officers with that score would be returned for further scoring until the cut line fell between officers having different scores. . . .

. . . .

The SERB's selection of records to be rescored was based strictly on scores and without regard to the race or gender of any particular officer. The SERB rescored all of the records that fell into the expanded "gray area". With one exception, the SERB did not rescore the records that fell outside of the "gray area". I did return for rescoring the record of a former Prisoner of War who was extremely low in the order of merit. I believed that merely returning the record along with the others that required rescoring was consistent with the Secretarial directive to "give due consideration to those who have gallantly served their country in unique situations such as having served honorably as Prisoners of War". To the best of my recollection, the board did not change this officer's score significantly, if at all. His score left him in the 30 percent selected to be retired. I was satisfied, however, that his experience as a Prisoner of War had been given due consideration.

At some point near the end of the proceedings, but before the scoring was completed, the administrative staff provided me with preliminary statistics concerning the selection rates of women and minority officers. The statistics were not provided to, or otherwise brought to the attention of, the board members. *This information did not affect in any way the SERB's deliberations and no records were rescored based upon this information.* As I was satisfied that the process was fair and the members had adhered to their oath and

the Secretary's guidance, I did not take any action based on any resulting statistical disparities among the reported categories of women and minority officers or between those groups and the overall board selection rate.

Paragraph 5 of the letter to the Secretary regarding the Board Proceedings included the following language:

To ensure each minority and woman officer received fair and equitable consideration, the board president carefully reviewed their records and the scoring results. Where there was any doubt as to the competitiveness of an officer, he caused the record to be rescored to resolve the doubt. It is the judgment of the board president and the members of the board that those officers recommended for retention are the best qualified officers.

*I did carefully, although selectively, review the records and scoring results.* I was satisfied that the members were fairly evaluating the records. I was confident that the procedures the SERB implemented ... identified the best qualified officers. All of my observations led me to believe that the members of the board executed their duties without prejudice or partiality. For these reasons, and with the one exception of the Prisoner of War previously mentioned, *I never had reason to cause a specific record to be rescored to remove doubt about the particular officer's competitiveness....*

I did not actually draft the specific language contained in the letter to the Secretary. I signed the draft letter the administrative staff prepared, because the draft appeared to be a fair description of the proceedings. In hindsight, other words might have more precisely portrayed the SERB's deliberations.

Declaration of Lt. Gen. John E. Jaquish (Ret.) (undated), at 2–7 (emphasis added).[7] Plaintiffs have moved to strike the declarations of Lt. Gen. Jaquish and Lt. Col. Wilson as representing *post-facto* supplementation of the record.

## DISCUSSION

Plaintiffs contend that by submitting the declarations on June 1, 1995, defendant goes "beyond the administrative record concerning matters not within the scope of the Court approved discovery, [and] in effect seeks to rewrite the filed administrative record." Plfs' Mot. filed July 10, 1995, at 4. Relying on *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam), and *Sierra Club v. Marsh*, 976 F.2d 763, 772–73 (1st Cir.1992), defendant responds that the declarations are explanatory of the FY92SERB process, rather than new rationalizations for the actions of FY92SERB.

This motion calls into serious question the bona fides of defendant's Pavlovian resistance to any judicial review of military decisions. Indisputably, plaintiffs rely on a letter signed by 28 Air Force Officers, including the voting members of the FY92SERB. The purpose of the letter was to report on the procedures undertaken by the FY92SERB. This letter forms the basis of plaintiffs' proposed finding No. 21, which reads:

The President of the FY92SERB, Lieutenant General John E. Jaquish, interpreted the equal opportunity instruction as requiring special consideration for minority and female officers. In carrying out the equal opportunity instruction Lieutenant General Jaquish, following the initial scoring of officer selection folders by the SERB panels, personally reviewed the officer selection folders of minority and female officers and required each case in which a minority or female officer was in jeopardy of selection for involuntary retirement that the selection folder be referred to a different panel of the FY92SERB for rescoring. Lieutenant General Jaquish determined at his personal discretion which officers were minorities and which minority and female officer selection folders warranted rescoring.

Plfs' Amended Proposed Findings of Fact No. 21, filed Apr. 17, 1995. The point to be made is not, as defendant urges, that plaintiffs' proposed finding is "factually incorrect,"

---

7. The declaration also denies the use of pre-    selection lists.

Def's Br. filed July 24, 1995, at 3, because it draws inferences beyond the literal statement. Rather, the point is that the Air Force's Force Reduction Branch Records, by the Air Force's own admission, are factually incorrect. Defendant astonishingly insists that courts should decline to look at how an early retirement selection board cuts short the careers of officers who have served their country honorably, or, as plaintiffs poignantly describe the process: "[The SERB process] is used to prematurely terminate careers that have otherwise been successful." Plfs' Amended Compl. filed Feb. 14, 1995, ¶ 5. Defendant makes this assertion

> upon the basis of the presumption that Government officials generally, and military selection boards specifically, conduct their duties lawfully and in good faith. *Bockhoven v. United States* [*Bockoven v. Marsh*], 727 F.2d 1558, 1563 [ (Fed.Cir. 1984), *cert. denied,* 469 U.S. 880, 105 S.Ct. 245, 83 L.Ed.2d 183 (1984) ]. Although the language in the cited letter is not entirely clear, the language most certainly does not support Baker's proposed finding.

Def's Br. filed July 24, 1995, at 3. However, defendant concedes: "To the extent that Baker properly raised an issue calling in question the sufficiency of the existing record, defendant made inquires and through declarations now seeks to clarify the record." *Id.*

In opposing plaintiffs' motion for pre-complaint discovery, defendant stated: "Baker suggests no basis upon which this Court could properly conclude that the SERB failed to comply with the Secretary's direction." Def's Br. filed Aug. 10, 1994, at 26. Au contraire, plaintiffs found a document in the contemporaneously filed administrative record that revealed a significant procedural error. 28 Air Force officers signed a statement certifying that their actions were dead wrong. Had that error in rescoring to which they attested in fact occurred, it may have amounted to a violation of procedure and perhaps regulation. The signatory officers failed to read the report, or signed signature pages only, or were unaware of the proceedings in which they ostensibly participated. Any of these scenarios dispels the faith and confidence in being treated fairly that each officer under consideration by the board rightfully was entitled to repose in the board proceedings. Defendant would deny plaintiffs the right to learn anything further about that document. Defendant resisted the limited discovery allowed by the court by insisting that the courts cannot review military decisions and that the military is entitled to a presumption of regularity. Yet, when confronted by an admitted irregularity, revealed in a document that defendant disclosed before any discovery was allowed, defendant now argues that it should be allowed to set the record straight by tendering declarations to explain that the actual proceedings complied with procedure and regulation and only the statement explaining them was in error.[8] As unbalanced as this position appears at first examination, it is correct.

On August 10, 1994, before the order entered allowing pre-complaint discovery, defendant filed the administrative record, including the volume captioned "Force Reduction Branch Records." The report of the FY92SERB is found in that volume. Paragraph 17 of the amended complaint targets the rescoring of minorities as a procedural violation. This allegation is based on the board's report. The military has, and should be given, leave to submit declarations from competent persons who can explain what the meaning of a contemporaneous document, such as the report of the FY92SERB.

In *Camp v. Pitts,* respondents submitted an application to the Comptroller of the Currency for a certificate authorizing them to organize a new bank in Hartsville, South Carolina. The Comptroller denied the application and notified respondents of his decision through a brief letter, which stated in part: "[W]e have concluded that the factors in support of the establishment of a new

---

8. In a remarkable feat of logic, defendant trivializes plaintiffs' contention that the Air Force in effect applied a quota to minority selection, thereby to mirror the overall selection rate, *i.e.,* 30 percent (it was actually 29.2 percent), by arguing that the minority selection rate exceeded *30 percent of the minorities, i.e., 28 out of 93,* or 30.1 percent. The flaw in this approach is that it is premised on a competitive pool including only minorities.

**818**

National Bank in this area are not favorable." 411 U.S. at 138, 93 S.Ct. at 1242. The court of appeals held that the comptroller's ruling was "unacceptable" because "its basis" was not stated with sufficient clarity to permit judicial review. *Id.* at 140, 93 S.Ct. at 1243. Upon further review the Supreme Court then held:

> If, as the Court of Appeals held and as the Comptroller does not contest, there was such a failure to explain administrative action as to frustrate effective judicial review, the remedy was not to hold a *de novo* hearing but, as contemplated by *Overton Park* [401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)], to obtain from the agency, either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary.

*Id.* at 142–43, 93 S.Ct. at 1244.

In *Sierra Club v. Marsh,* the Club brought suit challenging the adequacy of an environmental impact statement for proposed marine port project. The Sierra Club requested declaratory and injunctive relief halting construction of the marine dry cargo terminal on Sears Island. The First Circuit held in regard to the supplementation of the administrative record that "new material [may be added], however, [it] should be explanatory of the decisionmaker's action at the time it occurred. No new rationalizations for the agency's decision should be included...." 976 F.2d at 772 (citations omitted). The proffered declarations do not run afoul of these precedents. Accordingly, based on the foregoing,

**IT IS ORDERED,** as follows:

Plaintiffs' motion to strike is denied.