155 F.3d 1115
 58 Soc.Sec.Rep.Ser. 383, 98 Cal. Daily Op.
Serv. 7113,
98 Daily Journal D.A.R. 9853
ALVARADO COMMUNITY HOSPITAL, Alvarado Hospital Medical
Center, Central Plains Hospital, Century City Hospital,
Cherokee County Memorial Hospital, Chico Community Hospital,
Community Hospital of Los Gatos, Delray Community Hospital,
Doctors Hospital, Dallas, Doctors Hospital of Lakewood,
Doctors Hospital of Lakewood, Clark, Doctors Hospital of
Lakewood, South, Doctors Hospital of Manteca, Doctors
Hospital of Montclair, Doctors Hospital of Pinole, Doctors
Medical Center of Modesto, Dominguez Medical Center,
Garfield Medical Center, Harton Medical Center, Highland
Hospital, Hillside Hospital, Hollywood Medical Center, J.E.
Smith/F.E. Hebert Hospital, Joellen Smith Medical Center,
John F. Kennedy Memorial Hospital, Lake Seminole Hospital,
Lincoln West Medical Center, Lodi Community Hospital, Los
Alamitos Medical Center, Los Altos Hospital, Manteca
Hospital, Meadowcrest Hospital, Ojai Community Hospital,
Ontario Community Hospital, Palms of Pasadena Hospital,
Placentia Linda Community Hospital, Redding Medical Center,
Memorial Medical Center, Russell County Medical Center, San
Diego Physicians and Surgeons Hospital, Trinity Medical
Center, Twin Cities Community Hospital, University General
Hospital, University Medical Center, West Boca Medical
Center, Paracelsus Healthcare Corporation, dba Bellwood
Medical Corporation, dba Bellwood General Hospital, Lincoln
Community Medical Corporation, dba Orange County Community
Hospital of Buena Park and formerly dba Buena Park Community
Hospital, Hollywood Community Hospital Medical Center, Inc.,
dba Hollywood Community Hospital, Lancaster Hospital Corp.,
dba Lancaster Community Hospital, Paracelsus Los Angeles
Community Hospital, dba Los Angeles Community Hospital,
Norwalk Hospital Corp. dba Norwalk Community Hospital,
Paracelsus Van Nuys Community Hospital Operating
Corporation, dba Van Nuys Community Hospital, West Covina
Health Center Corporation, dba West Covina Hospital,
Hollywood West Hospital Operating Corporation, dba West
Hollywood Hospital, Monrovia Hospital Corporation, dba
Monrovia Community Hospital, Chico Community Hospital, Inc.
dba Chico Community Hospital, Lodi Community Hospital, Inc.
dba Doctors Hospital of Lodi, Paracelsus Peninsula Medical
Center, Inc. dba Peninsula Medical Center, Paracelsus Clay
County Hospital Inc., dba Clay County Hospital, Paracelsus
Fentress County General Hospital, Inc. dba Fentress County
General Hospital, Paracelsus Macon County Medical Center,
Inc. dba Flint River Community Hospital and formerly dba
Macon County Medical Center, AMI Hospitals of Texas, LTD.,
dba AMI Brownsville Medical Center, AMI Heights Hospital,
AMI Mid-Jefferson Hospital, Nacogdoches Medical Center, AMI
Park Place Hospital, AMI Park Plaza Hospital, AMI Twelve
Oaks Hospital, New H Arroyo Grande, Inc. dba Arroyo Grande
Hospital, Amisub of Georgia, Inc. dba Barrow Medical Center,
Lifemark Hospitals of Texas, Inc., dba AMI Bellaire Hospital
Byrd and Southwestern General Hospital, Brookwood Medical
Center of Eufala, Inc., dba Brookwood Medical Center of
Eufala, Brookwood Health Services, Inc. dba AMI Brookwood
Medical Center, Lifemark Hospitals of Louisiana, Inc., dba
Byrd Memorial Hospital dba AMI St. Judes Medical Center,
Central Arkansas Hospital, Inc. dba Central Arkansas
Hospital, Amisub of North Carolina, Inc. dba Central
Carolina Hospital, New H Circle City, Inc. dba AMI Circle
City Hospital, Clairemont General Hospital, Inc., dba
Clairemont Community Hospital, Notami Hospitals of Oklahoma,
Inc. dba Claremore Community Hospital, Doctors Medical
Center and Southwestern Medical Center, Clearwater Community
Hospital, L.P. dba Clearwater Community Hospital, Coastal
Bend Hospital, Inc. dba Coastal Bend Hospital,
Lifemark Hospital of Missouri, dba AMI Columbia Regional
Hospital, Rocky Mount Sanitarium Development Corporation,
dba Community Hospital of Rocky Mount, Amisub (Culver Union
Hospital), Inc. dba AMI Culver Union Hospital, Denton
Regional Medical Center, Inc. dba Denton Regional Medical
Center, 13th Street Corp., dba Doctors Hospital of
Opelousas, Doctors' Memorial Hospital, Inc., dba Doctors'
Memorial Hospital, East Cooper Community Hospital, Inc. dba
AMI East Cooper Community Hospital, Eastway General
Hospital. Ltd., dba Eastway General, Amisub French Hospital,
dba AMI French Hospital, Frye Regional Medical Center,
Garden Park Community Hospital LP, dba Garden Park Community
Hospital, Medical Center of Garden Grove, New H Glendora,
Inc., dba AMI Glendora Community Hospital, Amisub (North
Plains Hospital), Inc. dba Golden Plains Hospital, Gordon
Crowell Memorial Hospital, Amisub (McIntosh Trail Regional
Medical Center), Inc. dba Spalding Regional Hospital, fka
Griffin Spalding Hospital, Harris Hospital and Clinic, dba
Harris Hospital, Notami Hospitals of California, Inc. dba
Healdsburg General Hospital, Mission Bay Memorial Hospital
and Valley Medical Center, Citizens General Hospital of
Houston, Inc. dba Institute for Immunological Disorders (fka
Citizens General Hospital), Natomi Hospitals of Louisiana,
Inc. dba Highland Park Medical Center and Westpark Community
Hospital, Brookwood Medical Center of Houston, Inc. dba
Houston Community Hospital, Katy Medical Center, Inc., dba
Katy Medical Center, Amisub (American Hospital), Inc. dba
AMI Kendall Regional Medical Center (fka American/Miami),
Notami Hospitals of Florida, Inc. dba Lake City Medical
Center, Lucy Lee Hospital, Inc., dba Lucy Lee Hospital,
Medical Arts Hospital of Dallas, Inc., dba Medical Arts
Hospital-Dallas, Medical Arts Hospital of Texarkana, Inc.,
dba Medical Arts Hospital-Texarkana, Valley Doctor's
Hospital, dba North Hollywood Medical Center, Medical Plaza
Hospital, Inc. dba Medical Plaza Hospital, Memorial Hospital
of Tampa, Ltd., dba Memorial Hospital of Tampa, National
Park Medical Center, Inc. dba National Park Medical Center
(fka Ouachiata Memorial Hospital), North Fulton Medical
Center, Inc. dba AMI North Fulton Regional Hospital, Amisub
(North Ridge Hospital), Inc. dba North Ridge Medical Center,
Mckinney Joint Venture dba North Texas Medical Center;
Lister Hill Hospital, Inc. dba Northwest Alabama Medical
Center, Odessa Hospital, Ltd. dba Odessa Regional Hospital
(fka Odessa Women's and Children's Hospital), Palm Beach
Gardens Community Hospital, Inc. dba AMI Palm Beach Gardens
Medical Center, Lifemark Hospitals of Florida, Inc. dba AMI
Palmetto General Hospital, Hospital Constructors, Ltd. dba
AMI Town & Country Hospital, Parkway Hospital, Inc. dba
Parkway Hospital, Parkway Regional Medical Center, Inc. dba
Parkway Regional Medical Center, Amisub of South Carolina,
Inc. dba AMI Piedmont Medical Center, Brookwood Medical
Center of Orlando, Inc. dba AMI Medical Center of Orlando
(fka Brookwood Community Hospital), Amisub of California,
Inc. (fka Rancho Encino Hospital), HCMH, Inc. dba Medical
Park Hospital, Southwest Medical Center, Inc. dba Riverside
Community Hospital, Round Rock Hospital, Inc, dba Round Rock
Hospital, San Dimas Community Hospital, Inc. dba AMI San
Dimas Community Hospital, Amisub (Sierra Vista), Inc. dba
AMI Sierra Vista Regional Medical Center, New H South Bay,
Inc., dba South Bay Hospital, Amisub of Florida, Inc., dba
AMI Southeastern Medical Center, Creighton Saint Joseph
Regional Healthcare System, L.L.C. dba Saint Joseph
Hospital, St. Mary's Hospital, Inc., dba AMI St. Mary's
Regional Medical Center, AMI/HTI Tarzana Encino Joint
Venture, dba Tarzana Regional Medical Center, Terrell
Community Hospital, Inc. dba Terrell Community Hospital,
HealthOne, dba Presbyterian/St. Luke's Medical Center (fka
St. Luke's Medical Center and Presbyterian-Denver Hospital),
West Alabama General Hospital, Inc. dba AMI West Alabama
Hospital, Westbury Hospital, Inc. dba Westbury Hospital,
West Los Angeles Physician's Hospital, LP dba Westside
Hospital, Unihealth America, Inc. dba California Medical
Center, Santa Monica Medical Center, Martin Luther Medical
Center, and Valley Hospital Medical, County of Los Angeles,
a political subdivision of the State of California, owner &
operator of Los Angeles County/USC Medical Center,
Harbor/UCLA Medical Center, Martin Luther King, Jr./Drew
Medical Center, Olive View Medical Center & High Desert
Hospital, Plaintiffs-Appellants,
v.
Donna E. SHALALA, Secretary, United States Department of
Health & Human Services, Defendant-Appellee.
 No. 96-55967.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 6, 1997.
Decided Sept. 11, 1998.
 
 Lloyd A. Bookman, John R. Hellow, Byron J. Gross, and Jonathan P. Neustadter, Hooper, Lundy & Bookman, Inc., Los Angeles, California, for plaintiffs-appellants.
 Peter R. Maier, United States Department of Justice, Washington, DC, for defendant-appellee.
 Appeal from the United States District Court for the Central District of California; Robert M. Takasugi, District Judge, Presiding.
 Before: REINHARDT and TASHIMA, Circuit Judges, and SHADUR, District Judge.*
 REINHARDT, Circuit Judge:
 
 
 1
 One hundred and sixty-three hospitals (the "Hospitals") seek payment for alleged shortfalls in Medicare reimbursements for fiscal years 1985 (FY 1985) and 1986 (FY 1986). The Hospitals, which provided care for patients whose hospital stays were unusually lengthy or costly, contend that they were not properly reimbursed under the Medicare program at a time when the method of payment was in transition. They assert, more particularly, that the total amounts paid to them failed to meet a minimum figure required by statute and that the payments were determined in a manner that violated the Administrative Procedures Act ("APA").
 
 STATUTORY AND REGULATORY FRAMEWORK
 
 2
 The Secretary of the United States Department of Health and Human Services (the "Secretary") reimburses health-care providers for medical services provided to Medicare patients under the Health Insurance for the Aged Act ("the Act"). 42 U.S.C. § 1395f(b)(1). Before October 1, 1983, hospitals were reimbursed the lesser of their "customary charges" or the "reasonable costs" of their services. In an attempt to lower Medicare expenditures, Congress created the Prospective Payment System ("PPS"). Under PPS, the Secretary normally reimburses hospitals at a fixed amount for each patient discharged regardless of the costs incurred by the hospital. 42 U.S.C. § 1395ww(d)(1). Congress intended this method of payment to encourage hospitals to cut costs and increase efficiency. See Methodist Hosp. of Sacramento v. Shalala, 38 F.3d 1225, 1227 (D.C.Cir.1994) (citing Congressional Reports).
 
 
 3
 The fixed amount paid to hospitals under PPS is based on a standardized amount that is multiplied by a weighing factor. 42 U.S.C. § 1395ww(d)(2)(G), (3)(D). The standardized amount is a base amount that equals the average Medicare allowable cost per discharge for all hospitals participating in the Medicare program in a base year, which is adjusted according to regional wage variations, indirect medical education costs, and hospital case mix. 42 U.S.C. § 1395ww(d)(2). The weighing factor is a multiplier based on the diagnosis related group ("DRG") in which the discharged patient's illness falls. The Secretary has created 470 DRGs, each with a weight derived from the relative cost to treat a patient in that DRG. 42 U.S.C. § 1395ww(d)(4).
 
 
 4
 Hospitals first became subject to PPS in fiscal year 1984, beginning on October 1, 1983. 42 U.S.C. § 1395(d)(1)(A)(i). Thereafter, the Secretary phased in PPS over four years. During the phase-in years, Medicare reimbursements comprised two portions. The "hospital specific portion" was calculated under the prior system, based on the hospital's actual costs. 42 U.S.C. §§ 1395ww(d)(1)(A), (C). The other portion, the "federal rate," was determined under PPS. Id. The hospital specific portion of the reimbursements was 75% in FY 1984, 50% in FY 1985, 45% in 1986, and 25% in 1987, while the federal rate increased correspondingly. 42 U.S.C. § 1395ww(d)(1)(C). Thereafter, all reimbursements were calculated under PPS.
 
 
 5
 Under PPS Congress also provided for additional payments for patient discharges that qualified as "outlier" cases, which involved unusually costly or lengthy patient treatments. "Day outliers" occur when a patient's length of stay ("LOS"), measured in days, exceeds the mean LOS for a particular DRG by a fixed number of days or standard deviations. 42 U.S.C. § 1395ww(d)(5)(A)(i). "Cost outliers" occur when the cost exceeds a fixed multiple of a particular DRG's payment rate or exceeds the rate by a fixed dollar amount. 42 U.S.C. § 1395ww(d)(5)(A)(ii). The amount of additional payments for these cases "shall be determined by the Secretary and shall approximate the marginal cost of care" beyond the applicable cut-off point. 42 U.S.C. § 1395ww(d)(5)(A)(iii). Finally, the statute provides that
 
 
 6
 [t]he total amount of the additional payments made under this subparagraph for discharges in a fiscal year may not be less than 5 percent nor more than 6 percent of the total payments projected or estimated to be made based on DRG prospective payment rates for discharges in that year.
 
 
 7
 42 U.S.C. § 1395ww(d)(5)(A)(iv) ("Clause (iv)") (emphasis added).
 
 
 8
 The Secretary derives the standardized amount from the cost of all hospitals' discharges in a given year, including the outlier cases. In order to avoid overpaying hospitals generally for their expenses, the Secretary reduces the average standardized amount "by a proportion equal to the proportion (estimated by the Secretary) of the amount of payments under this section based on [outlier cases]." 42 U.S.C. §§ 1395ww(d)(2)(E), (3)(B). The Secretary then "sets aside" this amount to pay for the outlier cases. The outlier payment mechanism is designed not to increase the total amount of money paid out to hospitals; rather, it seeks to apportion in advance the anticipated total annual expenditure in a manner that will ensure that those hospitals specializing in "outlier" cases are not underpaid. However, under the Secretary's interpretation of the statute, if the Medicare program fails to pay out the full amount it sets aside for outlier payments in a particular year, then in that year the total amount it would pay out would in all likelihood be less than the total estimated cost of all hospital discharges.
 
 
 9
 The Secretary publishes the methodology and data used in computing all DRG rates, including the thresholds to be used for calculating outlier payments, prior to the beginning of each fiscal year. See 42 U.S.C. § 1395ww(d)(6). For FYs 1984 and 1985, the Secretary used the 1981 Medicare Provider Analysis and Review file ("1981 MEDPAR"), a random sample of 20% of all hospital discharges during 1981, to set the thresholds so that total estimated outlier payments would equal 5.0% of total payments. 49 Fed.Reg. 34728, 34769, 34795 (Aug. 31, 1984).[1] For FY 1986, the Secretary set the outlier thresholds using data from FY 1984. 50 Fed.Reg. 35646, 35709 (Sept. 3, 1985). The Secretary, however, delayed implementation of the FY 1986 outlier thresholds based on her interpretation of Congressional enactments requiring that Medicare payment rates in effect on September 30, 1985 be retained until May 1, 1986. See 51 Fed.Reg. 4166 (February 3, 1986). Thus, for the first eight months of FY 1986, payments were made using the FY 1985 thresholds.[2]
 
 FACTS AND PROCEDURAL HISTORY
 
 10
 Each of the Hospitals appealed its Medicare reimbursements for FYs 1985 and 1986 to the Provider Reimbursement Review Board ("PRRB") pursuant to 42 U.S.C. § 1395oo. The PRRB accepted jurisdiction over each appeal and granted all of the Hospitals' requests for expedited judicial review, expressing no views on the merits.
 
 
 11
 The Hospitals then brought this action in federal district court. The Hospitals first contended that the Secretary breached her statutory duty under Clause (iv) by failing to make outlier payments equalling five to six percent of the total estimated or projected total PPS payments in FYs 1985 and 1986. The parties agree that for FY 1985, outlier payments totaled three percent, $241 million less than five percent of total estimated federal rate payments; and for FY 1986, they totaled 4.4 percent, $101 million less than five percent of total estimated federal rate payments. The Hospitals also contended that the FY 1985 thresholds, which were based on the 1981 MEDPAR file and were used for FY 1985 and the first eight months of FY 1986, were determined in an arbitrary and capricious manner in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). This contention is based on the ground that the MEDPAR 1981 file failed to reflect the anticipated decreasing average LOS under PPS and that as a result too few patient discharges were deemed "outliers." The Hospitals requested declaratory relief with respect to the Secretary's asserted violations of both the Act and the APA and an order awarding each of them a pro-rata share of sums due.
 
 
 12
 On cross-motions for summary judgment, the district court held with respect to the Act that "it cannot be clearly determined that Congress intended the Secretary to recalculate outlier payments after final payment data became available," and that the Secretary's construction of the statute was permissible.[3] With respect to the APA, it held that the Secretary's decision to rely on the 1981 MEDPAR data rather than more recent data was neither arbitrary nor capricious. The district court accordingly granted summary judgment to the Secretary and dismissed the action.
 
 DISCUSSION
 
 13
 We discuss the APA claim first. The Hospitals contend that the Secretary acted arbitrarily and capriciously when setting the outlier thresholds for FY 1985 because she relied on the 1981 MEDPAR data instead of preliminary data available from FY 1984 and failed to offer an adequate explanation for doing so. The Secretary contends that she properly decided not to rely on incomplete and preliminary data and adequately explained her decision. Although the FY 1984 thresholds are not at issue, the Secretary relies, in part, on explanations from the 1984 rulemaking record, as well as on explanations that are outside both the 1984 and 1985 records.
 
 
 14
 For FY 1985 the Secretary established the day outlier and cost outlier thresholds so that total estimated outlier payments for FY 1985 would be 5.0 percent of total estimated payments. 49 Fed.Reg. 34728, 34768 (Aug. 31, 1984). Day thresholds were set so as to equal the mean LOS within each DRG plus the lesser of 22 days (as compared to 20 days for FY 1984) or 1.94 standard deviations. 49 Fed.Reg. 34728, 34768. All thresholds were set according to the MEDPAR 1981 data. See 49 Fed.Reg. 27447 (July 3, 1984).
 
 
 15
 The Secretary twice addressed the decision to continue using the 1981 MEDPAR data for the 1985 calculations. First, in response to comments criticizing the outlier thresholds on the ground that they would result in outlier payments "well below the 6.0 percent expected outlier payment level," the Secretary stated:
 
 
 16
 We calculated the revised outlier thresholds using 1981 MEDPAR data such that estimated outlier payments would equal 5.0 percent of total Federal DRG payments. The length-of-stay and cost outlier criteria were calibrated so that the national average shares of length-of-stay and cost outlier payments would be 85 and 15 percent respectively....
 
 
 17
 Based upon outlier and DRG payment data received through July 27, 1984, there is no evidence to suggest that total outlier payments are below the levels intended. Therefore, ... we are continuing to set the outlier thresholds on the basis of the 1981 MEDPAR data.
 
 
 18
 49 Fed.Reg. 34769 (Aug. 31, 1984).
 
 
 19
 Second, in response to comments suggesting that the mean LOS for individual DRGs be recalculated based on actual PPS experience in order to accommodate decreasing LOS, the Secretary responded that
 
 
 20
 [t]he standardized amounts reflect the number of inpatient days per case based on 1981 hospital experience. Therefore, if the mean length of stay were recalculated to reflect the actual changes in lengths of stay from the 1981 database, adjustment to the standardized amounts would also be required to reflect the decreased costs resulting from shorter inpatient stays.
 
 
 21
 Id. at 34768-69.
 
 
 22
 The Secretary did, however, use preliminary FY 1984 data to adjust all DRG weighting factors by 1.05 percent to respond to increases in hospital case-mix values.[4] 49 Fed.Reg. 34728, 34770-71 (Aug. 31, 1984). In responding to a comment suggesting that no adjustments be made with respect to case-mix values, the Secretary defended her use of the new data stating that previously,
 
 
 23
 we did not have data on how the payment incentives established by the prospective payment system would affect reporting of diagnoses and procedures. Therefore, the adjustments we made did not reflect potential behavioral changes related to those incentives. To date, we have now analyzed 2.5 million discharges under the prospective payment system, which fully reflects those incentives, and we believe this affords us a better measure of the effect of coding improvements in the average case mix.
 
 
 24
 49 Fed.Reg. 34728, 34771 (Aug. 31, 1984).
 
 
 25
 Under the APA, we determine if the Secretary's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); Mt. Diablo Hosp. v. Shalala, 3 F.3d 1226, 1230 (9th Cir.1993). A decision may be found to be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); Beno v. Shalala, 30 F.3d 1057, 1073 (9th Cir.1994).
 
 
 26
 A rule may also be invalidated under the APA if an agency fails to explain the rule adequately. Mt. Diablo Hosp., 3 F.3d at 1233-34; Yerger v. Robertson, 981 F.2d 460, 463 (9th Cir.1992). However,
 
 
 27
 [t]here is no obligation to make references in the agency explanation to all the specific issues raised in comments. The agency's explanation must simply enable a reviewing court to see what major issues of policy were ventilated by the informal proceedings and why the agency reacted to them the way it did.
 
 
 28
 Mt. Diablo, 3 F.3d at 1234 (quoting South Carolina ex rel. Tindal v. Block, 717 F.2d 874, 886 (4th Cir.1983)).
 
 
 29
 We conclude that the Secretary failed to offer an adequate explanation for the decision to rely on the 1981 MEDPAR data rather than more recent data that would reflect decreasing LOS. The Secretary's response that the outlier thresholds would not be adjusted because standardized amounts would also need to be adjusted is simply no explanation at all. The fact that other variables would need to be adjusted hardly identifies any of "the major issues of policy" involved in the Secretary not adjusting either the thresholds or the standardized amounts. Further, the response indicates that the Secretary was quite aware that LOS had decreased after the implementation of PPS.
 
 
 30
 The Secretary's other explanation for using the 1981 MEDPAR file, that "[b]ased upon outlier and DRG payment data received through July 27, 1984, there is no evidence to suggest that total outlier payments are below the levels intended," was simply not supported by evidence before the Secretary. The Secretary does not dispute that "[the data] consisted of raw billing data suggesting that outlier payments reported to the agency during the first half of the year were less than the target for fiscal year 1984," Sec. Br. at 54, but only argues, first, that the preliminary data was incomplete, and, second, that the final figures for outlier payments were higher than the preliminary data indicated. The Hospitals' experts, on the other hand, state that the preliminary data clearly indicated outlier payments were going to fall below their projected amounts. Even resolving all ambiguities and drawing all inferences in favor of the Secretary, her explanation that there was no evidence of an outlier shortfall was simply not supported by the record before her and did not explain her failure to use the more recent data.[5]
 
 
 31
 The Secretary's use of the preliminary 1984 data to adjust for increasing case-mix values further undercuts her failure to use it with respect to the outlier thresholds. The Secretary defended the use of such data because it "reflected potential behavioral changes" caused by PPS. Given that decreased LOS was a primary goal of PPS, and given the prominence of LOS values in calculating outlier thresholds, the Secretary's failure to explain why the preliminary 1984 data could not be used to calculate the new thresholds was particularly inexplicable. The Secretary now contends that an across-the-board adjustment that was made with respect to the case-mix values differs from a calculation of the outlier thresholds because the outlier thresholds require individual computations of standard deviation for each individual DRG. This explanation is itself of questionable sufficiency and fails to address adequately the reasons why the preliminary 1984 data could not be used when individual computations are required.[6] In any event, no explanation at all was offered at the time the pertinent administrative record was made.
 
 
 32
 The "larger" administrative record does not, contrary to the Secretary's contentions, help to identify the major issues considered by her in reaching her decision. The Secretary points to two statements made in the 1984 rulemaking record, which stated that the 1981 MEDPAR file would be used to determine thresholds for FY 1984. Medicare Program; Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed.Reg. 39752, 39843 (Sept. 1, 1983).[7] First, the Secretary responded to comments about the determination not to make certain adjustments to payment rates in anticipation of certain factors, such as FICA taxes and appeals related to costs disallowed in hospitals' base periods (and not decreasing LOS):
 
 
 33
 Regarding additional adjustments recommended by the commenters, we made no adjustments to either the adjusted standardized amounts or to the budget neutrality estimates for conditions that could not be quantified on the basis of currently available data, even if there were a likelihood that these conditions might exist under prospective payment.
 
 
 34
 Medicare Program; Prospective Payments for Medicare Inpatient Hospital Services, 49 Fed.Reg. 234, 255 (Jan. 3, 1984). Second, in a preliminary impact analysis of the expected behavior changes under PPS, the Secretary observed that cost-cutting through reduced LOS would vary from hospital to hospital, depending on the backlog and occupancy rates, and the ratio of the cost of ancillary services used to shorten hospital stays as weighed against the savings from reductions in length-of-stay. Id. at 304.
 
 
 35
 Even assuming that we may examine this "larger" record and that statements made in the 1984 record could provide explanations for a decision made the next year, neither the Secretary's response nor impact analysis explains the decision not to use the partial 1984 data for FY 1985. The Secretary's response on "conditions that could not be quantified" is of doubtful relevance because none of the commenters was referring to decreasing LOS, and further, because at the time PPS had been implemented for just three months. Second, the Secretary's prediction that LOS reductions would vary from hospital to hospital according to certain factors does not explain how such variations would cast doubt on the validity of the preliminary 1984 data reflecting decreasing LOSs. Thus, even according to the "larger" rulemaking record, the Secretary never adequately explained why the preliminary 1984 data, used to adjust other values for that year, was improper to use with respect to determining outlier thresholds.[8]
 
 
 36
 Finally, the Secretary also appears to rely on several explanations set forth in certain paragraphs of the Declaration of Rose Connerton, a government administrator who helped to set the outlier thresholds during the relevant years. The district court denied the Hospitals' motion to strike these portions of the declaration and appeared to rely on them in part in its decision to dismiss the APA claim. The statements at issue are the following:
 
 
 37
 (1) The basic assumption underlying the analysis was that the random sample of cases included within the 1981 MEDPAR file provided the best evidence available of the types of Medicare cases that were likely to occur in fiscal year 1984 and the probable frequency of outliers within each type of case or DRG.
 
 
 38
 (2) Specifically, HCFA anticipated based upon the MEDPAR sample that hospitals located in eastern states would qualify for a greater percentage of day outlier (Type A) payments while hospitals located in western states would qualify for a greater percentage of cost outlier (Type B) payments. Similarly, HCFA anticipated that teaching facilities (which are identified on the simulation by ratio of interns and residents/beds ("I-R Ratio")), large government hospitals, and not-for-profit hospitals would receive a significantly greater percentage of outlier payments than other types of facilities.
 
 
 39
 (3) At [the time of establishing FY 1985 outlier criteria], HCFA did not have a reasonably complete alternative source of data from which a representative random sample of Medicare cases in each DRG could be extracted.
 
 
 40
 (4) However, [the partial FY 1984 data] were not representative of a full year's set of prospective payment cases both because the fiscal year was not yet concluded and because most hospitals did not become subject to PPS until after the fiscal year began. As such, use of the data would have skewed the resulting outlier calculations by potentially introducing biases upon regional hospital practice patterns, the types of hospitals included (particularly the lack of cases treated by teaching hospitals), and seasonal factors (since much of the data related to illnesses treated [sic] in the winter months).
 
 
 41
 Connerton Decl. pp 10, 12, 15.
 
 
 42
 "We review [a] district court's decision to exclude extra-record evidence for an abuse of discretion." Southwest Ctr. for Biological Diversity v. U.S. Forest Svc., 100 F.3d 1443, 1447 (9th Cir.1996). A district court may go outside the administrative record for the purposes of background information or "for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision." Asarco, Inc. v. United States Envtl. Protection Agency, 616 F.2d 1153, 1160 (9th Cir.1980); see Idaho Conservation League v. Mumma, 956 F.2d 1508, 1520 n. 22 (9th Cir.1992). Of course, explanatory materials cannot be used to offer new rationalizations for agency action. See Bunker Hill Co. v. EPA, 572 F.2d 1286, 1292 (9th Cir.1977). That is precisely what the Connerton affidavit appears to do. It offers explanations for the Secretary's decision that easily could have been part of the administrative record had they been a basis for the Secretary's decision. The Connerton explanation does not, however, appear in the record. Thus, the district court improperly considered portions of the Connerton Declaration, and we will not consider them on appeal. See Asarco, 616 F.2d at 1160-61 (finding district court to have improperly considered expert testimony outside of the administrative record).[9]
 
 
 43
 Accordingly, neither the 1995 administrative record, nor even the "enlarged" record provides adequate explanation for the Secretary's decision to use the 1981 MEDPAR data rather than the preliminary 1984 data and we hold the decision to constitute an abuse of discretion. This holding is consistent with Mt. Diablo Hospital v. Shalala, which affirmed the Secretary's decision to use a particular database when she "simply chose one imperfect database over another while seeking to develop data superior to either." 3 F.3d 1226, 1233 (9th Cir.1993). In Mt. Diablo, the Secretary had stated in the record that the alternative database was less complete due to a particular categorical omission and that the database used provided the " 'most reliable data' " available. Here, the Secretary set forth no such rationales and further, without comment, used the preliminary 1984 data to make adjustments in other areas.
 
 
 44
 More important, in Mt. Diablo, the fact at issue that was not addressed by the Secretary was only of "minor significance at the time." 3 F.3d at 1234. In this case, the decreasing LOSs were highly significant--their decline was, as the Secretary has repeatedly acknowledged, a highly anticipated result of PPS. Nothing in the administrative record identifies the factors that motivated the Secretary to decide not to use the preliminary FY 1984 data that reflected that decline. See Beno v. Shalala, 30 F.3d 1057, 1074 (9th Cir.1994) (reversing and remanding to Secretary when administrative record did not indicate whether she considered important issues). Because the Secretary failed to explain her decision not to use the preliminary 1984 data with respect to the 1985 day outlier thresholds, and because the data was highly significant to an accurate determination of those thresholds, we find her to have abused her discretion in their determination.
 
 
 45
 Normally, if the " 'record before the agency does not support the relevant agency action,' " the proper course of action is to remand to that agency for further investigation and explanation. UOP v. United States, 99 F.3d 344, 351 (9th Cir.1996) (quoting Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)); see Beno v. Shalala, 30 F.3d at 1076 (remanding to Secretary for "additional consideration" of issues which administrative record shows she failed to consider). Therefore, on remand, the Secretary ordinarily would consider the preliminary 1984 data that was available when the original decision was made and either make appropriate use of the data now or provide a satisfactory reasoned explanation of her initial decision not to do so. It is now possible, however, for the Secretary to set the FY 1985 day-outlier thresholds according to the complete and more reliable data contained in the complete 1984 MEDPAR file, as she did in setting the thresholds for FY 1986. Because (1) the reimbursements at issue arose over thirteen years ago, (2) further recondite litigation might ensue if the Secretary merely attempts to provide further explanation for her decision, and (3) it is now possible not merely to estimate but rather to determine the precise thresholds necessary so that the outlier payments would equal five percent of the total projected payments, we direct the Secretary to use the final 1984 MEDPAR file to adjust the FY 1985 day-outlier thresholds so as to achieve the appropriate overall percentage payment and to pay the Hospitals the difference between what they are entitled according to the revised thresholds and what they were actually paid for FY 1985 and the pertinent portion of FY 1986.[10]
 
 
 46
 The relief we grant on the APA claim renders moot the Hospital's claim under the Act. Because with the additional payments the 1985 and 1986 reimbursements will meet the five to six percent standard set forth in the Act, we do not reach the question whether the Secretary is required to make adjustments when outlier payments fall short of that standard.
 
 CONCLUSION
 
 47
 We reverse the district court's decision granting summary judgment on the APA claim and grant the Hospitals' cross-motion for summary judgment on that claim. We remand to the Secretary for re-determination of the FY 1985 day outlier thresholds with instructions to recompute them using the 1984 MEDPAR file and to reimburse the Hospitals for any difference in outlier payments.
 
 
 48
 REVERSED AND REMANDED.
 
 
 
 *
 The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation
 
 
 [1]
 For FY 1984 the Secretary had set the thresholds to equal 5.7% of the total costs
 
 
 [2]
 For both fiscal years the Secretary intended day outlier payments to comprise 85% of outlier payments and cost outlier payments to comprise 15% of outlier payments
 
 
 [3]
 The Secretary contended that Clause (iv) only required that the estimated outlier payments fall within the estimated or projected total payments under PPS and that in any event the statutory scheme did not require retroactive adjustments
 
 
 [4]
 Case-mix values measure the relative complexity of a hospital's caseload
 
 
 [5]
 It is undisputed that the Secretary predicted a decrease in LOS due to the implementation of PPS. In a December 1982 report to Congress, the Secretary stated that under PPS hospitals would seek to reduce lengths of stay. Report to Congress, Hospital Prospective Payment for Medicare, December 1982, 1984 Rulemaking Record at 81; see also 1985 Impact Report at 3.6-3.7 ("The most commonly accepted expectation about PPS at the time of its inception was that it would result in shorter stays for Medicare patients"). The Hospitals also note that prior to the calculation of the 1984 FY thresholds the Secretary had information that could help to predict how LOS values would decrease, including a Medicare demonstration project in New Jersey similar to PPS demonstrating an LOS reduction of 15 % from 1979 to 1981
 It is also undisputed that a decrease in LOS for FY 1984 actually occurred. A 1984 PPS Impact report issued on August 1986 indicated that actual outlier payments for FY 1984 was "largely due to the decline in length of stay in recent years and the decrease in charges per case under the PPS." Finally, an Impact Report for 1985 PPS concluded that for FY 1984 day outlier payments had been about 60% lower than anticipated due to decreasing LOS.
 
 
 [6]
 The validity of this explanation is also in doubt because an anticipated decrease in LOS could have been adjusted for by simply decreasing the number of additional days necessary or standard deviations required for a case to qualify as an outlier. Indeed, this is what the Secretary did in FY 1986
 
 
 [7]
 In response to comments suggesting a recalculation of a hospital's case-mix index using all of the 1981 data, the Secretary responded that "[t]he best available data are contained in the 1981 MEDPAR file." 49 Fed.Reg. 234, 260 (January 3, 1984)
 
 
 [8]
 The rulemaking record for FY 1986 is not relevant to whether the Secretary's determination of the FY 1985 thresholds was an abuse of discretion. Nonetheless, the Secretary appears to rely on it. While neither she nor we may make use of the information to justify the use of the 1981 MEDPAR file, the later record may help explain the unexpressed rationale behind the Secretary's choices for FY 1985
 For FY 1986 the Secretary revised the day outlier and cost outlier thresholds using 1984 MEDPAR data. 50 Fed.Reg. 35646, 35709 (Sept. 3, 1985). In a response to a comment that FY 1985 outlier payments were lower than expected, the Secretary pointed out that a substantial decrease in LOS reduced the number of cases qualifying for outlier payments. 50 Fed.Reg. 35710 (Sept. 3, 1985).
 In response to a comment suggesting that DRG relative weights be recalibrated, the Secretary responded,
 the FY 1984 prospective payment system cases are not representative of a full year's set of the prospective payment system cases because hospitals came on the prospective system at the start of their accounting year. For example, the hospital accounting year for many large teaching hospitals begins on July 1, so that their prospective payment system cases were limited to the fourth quarter of FY 1984. This phenomenon might also create seasonal effects that would not occur if data for a full year are used.
 
 
 [50]
 Fed.Reg. 35646, 35654 (September 3, 1985). These observations with respect to the FY 1984 data help to explain why the Secretary might not have wanted to use it for FY 1985. Since they are not part of the 1985 administrative record, however, they cannot affect our analysis with respect to the APA claim
 
 
 [9]
 The fact that the district court improperly considered material outside the record does not prevent us from conducting our own review of the administrative record without remanding the case to the district court. See Asarco, Inc., 616 F.2d at 1161
 
 
 [10]
 With respect to any of the plaintiffs that may have been overpaid for services rendered to non-outlier patients during the twenty months at issue as a result of the Secretary's allocation to outlier services of a reduced share of the total amount of payments, the amounts of such overpayments may be deducted from the additional reimbursements those plaintiffs would otherwise receive. We do not intend to suggest by this statement that the failure to properly calculate the outlier payments actually affected the amounts of the non-outlier payments. Rather, we simply wish not to preclude appropriate adjustments on that account should such be the case